# Exhibit A

## LICENSE AGREEMENT

THIS AGREEMENT, made as of the 28th day of October, 1988, by and between FIELD & STREAM LICENSES COMPANY, a Minnesota corporation, having its principal office at 14 Loring Road, Hopkins, Minnesota, 55343 (hereinafter called "F & S"), and GORDON & FERGUSON OF DELAWARE, INC., a Delaware corporation, having its principal office at 2915 Niagara Lane, Plymouth, Minnesota 55447 (hereinafter called Licensee).

WITNESSETH:

F & S is the owner of the trademarks "Field & Stream", "Field and Stream", "Town & Country", "Town and Country" and "Fieldstream" (the "Licensed Marks") for apparel and accessories and United States and foreign trademark registrations thereof as shown on Exhibit A attached hereto;

F & S may obtain additional United States and/or foreign Registrations of the Licensed Marks as it deems necessary or expedient for the conduct of its business which, together with the Registrations of Exhibit A, are referred to collectively herein as the "Licensed Registrations";

Licensee desires to acquire certain rights to use the Licensed Marks for specific apparel items.

F & S is willing to grant such rights on the terms and conditions specified herein.

NOW, THEREFORE, in consideration of the mutual terms and conditions set forth herein, the parties hereto agree as follows:

I.    GRANT AND TERRITORY.

A.    Subject to the terms of this Agreement, F & S hereby grants to Licensee the exclusive right, license and privilege to use, manufacture and sell the Licensed Products (as defined in Section IB) under the Licensed Marks, and any corresponding Licensed Registrations, anywhere in the world; provided, however, that the territory for the Licensed Mark "Fieldstream" shall be limited as provided in Section IA3.

1.    With regard to the Licensed Marks "Field & Stream" and "Field and Stream", the license granted by this Section I is limited to Outerwear for men, women and children.

2.    With regard to the Licensed Marks "Town & Country" and "Town and Country", the license granted by this Section I is limited to Outerwear for men and children.

3.  With regard to the Licensed Mark "Field&Stream", the license granted by this Section I is limited to those countries in which F & S now has or obtains in the future a registration thereof and is further limited to those apparel items for which Licensee has obtained a license from F & S (either by this Agreement or a subsequent written agreement) under the "Field & Stream", and "Field and Stream" marks.

B.  For purposes of this Agreement, the term "Licensed Products" shall mean all Outerwear sold under the Licensed Marks. "Outerwear" shall mean coats, jackets, blousons, vests, anoraks, parkas, ski jackets, ski bibs and ski pants, but only if such apparel is not designed and/or sold for active use in hunting or fishing.  "Outerwear" shall not include, without limitation, (i) suit jackets or sportscoat jackets, (ii) coats, jackets, blousons, vests, anoraks and parkas, or any other apparel products designed and/or sold for active use in hunting and fishing (whether or not made out of camouflage, tree bark, blaze (hunter orange) or other material), (iii) rainwear, including, without limitation, raincoats and rainsuits (whether of fabric, plastic, PVC or any other material), or (iv) other items of apparel not specifically enumerated hereunder as constituting "Outerwear"; provided, however, that Outerwear shall also include any item of Outerwear (as described in the second sentence of this Section IB) that is bought by and carried in a department store outerwear department.

C.  The license granted hereunder shall apply to the use of the Licensed Marks in connection with the specified items of apparel and not to any other trade name or any other trademark that F & S may own or use.

D.  Except as set forth in this License Agreement, F & S shall not utilize for itself, or grant any license of, the Licensed Marks for the Licensed Products.

II.  WARRANTIES.

A.  United States.  F & S represents and warrants to and covenants with Licensee that with respect to trademarks and United States Federal Registrations thereof, it is the owner of all right, title and interest in and to the Licensed Marks and Registrations thereof, as set forth in Exhibit A attached hereto, free and clear of all liens, claims, encumbrances, restrictions and proprietary rights of third parties; that none of said trademarks or trade names are licensed from any third party and F & S pays no royalty with respect to any of said Licensed Marks; that there is no pending, or to the actual knowledge of F & S, threatened, claim or litigation or interference proceeding in any court or in the U.S. Patent and Trademark Office or any similar foreign office for the registration of trademarks against F & S

2

or any affiliate thereof contesting their ownership or right to use any of the Licensed Marks for the Licensed Products, or asserting the misuse thereof or attacking F & S's title thereto; that F & S has never granted any license, rights, privileges or franchises to any third party anywhere in the world to utilize any of the Licensed Marks or Licensed Registrations for the Licensed Products or any other products or uses which would in any way conflict with the license granted to Licensee herein; that such Licensed Marks and Licensed Registrations are registered as set forth on Exhibit A attached hereto; that F & S has taken necessary action to renew and maintain such Registrations which are in full force and effect, except as shown; that F & S has all right, power and authority to enter into this Agreement and to grant to Licensee the rights herein under the Licensed Marks and Licensed Registrations thereof, and that this Agreement will not violate or conflict with or constitute a default under any agreement or writing of any nature to which F & S or any of its affiliates is a party.

   B.   Foreign   With respect to the Grant of Section 1 of this Agreement for the products specified therein for the territory outside the United States, F & S specifically does not warrant that it can grant any rights to use the Licensed Marks on the Licensed Products, but does warrant only the following:

      1.   F & S is the owner of various Trademarks, Registrations, and Applications for Registrations of the Licensed Marks in various countries in the world.

      2.   F & S has received no notice of any conflicting use outside the United States with respect to the Licensed Marks.

      3.   F & S has granted no license rights to others for the Licensed Products.

III.  USE OF LICENSED MARKS.

   A.   Licensee shall make no use of Licensed Marks except as specifically authorized herein and any use of the Licensed Marks by Licensee in connection with any product or service shall inure to the benefit of F & S for purposes of trademark ownership.  Licensee shall make no claim of ownership of the Licensed Marks, or any confusingly similar mark, in the United States or any foreign country, and shall not contest the validity of any Licensed Mark, or any registration thereof, nor benefit under this Agreement or otherwise, from any of its activities which adversely affect the validity of the Licensed Marks, or any registrations thereof anywhere in the world.

B.    Licensee shall not initiate any litigation, whether or not with others, which contests the validity of the Trademarks or F & S's rights in and to the Trademarks.  The use of the Trademarks pursuant to this Agreement shall be for the benefit of F & S for purposes of trademark ownership, and shall not vest in Licensee any title to or right or preemptive right to continue said use except to the extent granted in this Agreement.

C.    Licensee shall use the Licensed Marks only as trademarks and shall accompany each use with the symbol "®" (or such other marking as may be appropriate as designating that a Licensed Mark is Registered) as requested by F & S.  Marking requests by F & S under this section may vary country-by-country.

D.    F & S grants a non-exclusive right to Licensee to advertise the Licensed Products anywhere in the world.  F & S reserves for itself the right to advertise the Licensed Products of Licensee worldwide.

E.    Licensee shall have the right to utilize the type style(s) currently being utilized by Gordon & Ferguson Merchandising Company with respect to the Licensed Marks.  F & S shall have the right, if it so elects, to design proposed type styles to be used by Licensee with respect to the Licensed Marks and Licensee, at its sole option, may elect to utilize any such proposed type styles.  Licensee may design its own labels consistent with the terms of this Agreement.  Licensee may propose other type scripts using the Licensed Marks subject to F & S's approval, which will not be unreasonably withheld.

F.    The rights granted Licensee herein shall be exercised solely by Licensee; provided, however, that when the amount paid to F & S by Licensee under Section VI of this Agreement has reached the aggregate sum of One Million Five Hundred Thousand Dollars ($1,500,000), Licensee shall have the right to sublicense to others under the Licensed Marks subject to the terms and conditions of this Agreement including, without limitation, the limitations in the Grant hereof and the conditions of quality and quality control hereof.

IV.    RIGHT OF FIRST REFUSAL.

Subject to agreements entered into prior to the date of execution of this Agreement, including extensions, renewals, or modifications thereof, F & S agrees that prior to finalizing a license of the Licensed Marks with any third party not affiliated with F & S or any of its affiliates, other than a party to or successor to such prior agreements, for the following items of sportswear: shirts, pants or sweaters (unless such items are included in a license for hunting and fishing apparel, or rainwear, or as part of multiple products, i.e., a

4

rainsuit which includes a rain poncho and rain pants), F & S shall promptly notify Licensee of the terms and conditions under which F & S proposes to license such rights. Such notice shall constitute an offer ("Offer") to license to Licensee on such terms and conditions, and Licensee shall have a period of ten (10) days in which to accept such Offer. If Licensee does not accept such Offer, then F & S may enter into an agreement with such third party upon terms and conditions which are substantially the same as the terms and conditions included in the foregoing Offer to Licensee. Once such a license shall have been executed, Licensee shall have no further rights under this Section IV for the items licensed. If F & S does not enter into a license with such third party (as hereinabove defined), then F & S shall comply with the terms and conditions of this Section IV prior to finalizing a license with a new third party (as hereinabove defined).

V.    QUALITY, QUALITY CONTROL AND INSPECTION.

A.    Licensee shall use the Licensed Marks in a manner which will preserve and protect the reputation and prestige of F & S and the Licensed Marks, including the use of those marks as a designation of merchandise of the highest quality. Merchandise sold by Licensee under the Licensed Marks shall be of the same quality as to workmanship and material as that previously sold under the Licensed Marks by Gordon & Ferguson Merchandising Company and/or by F & S.

B.    Licensee acknowledges that the sale of merchandise not meeting standards of the highest quality can adversely affect the name and business reputation of F & S. Accordingly, F & S or its designated agents shall have the right upon reasonable notice to Licensee, and during regular business hours, to make reasonable inspections of the manufacturing facilities of Licensee, or parties manufacturing for Licensee, and of items within this Agreement that are in the process of manufacture. Upon the request of F & S, Licensee shall periodically submit to F & S samples of items proposed to be sold by Licensee, or of finished inventory, and shall discontinue or correct the manufacture of any items reasonably objected to by F & S as being of inferior quality.

C.    Merchandise of the "highest quality" shall be deemed to be the quality level of merchandise made and sold by Gordon & Ferguson Merchandising Company during the two (2) year period immediately prior to the execution of this Agreement.

D.    Licensee's failure to comply with the foregoing provisions of this Section V shall constitute an Event of Default hereunder.

5

## VI. LICENSE FEES.

A.   As consideration for the foregoing license, Licensee shall pay to F & S an annual license fee determined in accordance with this Section VI.

B.   The annual license fee with respect to 1988 and each calendar year thereafter shall be such amount as is equal to twenty-five percent (25%) of the net profits of Licensee earned during such calendar year up to and including Four Hundred Thousand Dollars ($400,000), and forty percent (40%) of the net profits of Licensee earned during such calendar year in excess of Four Hundred Thousand Dollars ($400,000); provided, however, that the annual license fee shall not exceed Five Hundred Thousand Dollars ($500,000) with respect to any calendar year.

C.   Notwithstanding the provisions of Section VIB, a minimum license fee as set forth in this Section VIC shall be payable with respect to each of the following calendar years:

1.   Unless this License Agreement is terminated during the first ninety (90) days of the calendar year 1989, a minimum license fee of One Hundred Seventy-Five Thousand Dollars ($175,000) shall be payable with respect to such calendar year.

2.   Unless this License Agreement is terminated during the first ninety (90) days of the calendar year 1990, a minimum license fee of One Hundred Seventy-Five Thousand Dollars ($175,000) shall be payable with respect to such calendar year.

3.   Unless this License Agreement is terminated during the first ninety (90) days of the calendar year 1991, a minimum license fee of One Hundred Seventy-Five Thousand Dollars ($175,000) shall be payable with respect to such calendar year.

4.   Unless this License Agreement is terminated during the first ninety (90) days of the calendar year 1992, a minimum license fee equal to the difference between:

(a) Seven Hundred Fifty Thousand Dollars ($750,000), and

(b) the total amount of all annual license fees paid hereunder with respect to the calendar years 1988 through 1991, shall be payable with respect to the calendar year 1992 on April 29, 1992.

5. Unless this License Agreement is terminated during the first ninety (90) days of the calendar year 1992, a minimum license fee of One Hundred Seventy-Five Thousand Dollars ($175,000) shall be payable with respect to such calendar year.

6. Unless this License Agreement is terminated during the first ninety (90) days of the calendar year 1993, a minimum license fee of One Hundred Seventy-Five Thousand Dollars ($175,000) shall be payable with respect to such calendar year.

7. Unless this License Agreement is terminated during the first ninety (90) days of the calendar year 1994, a minimum license fee of One Hundred Seventy-Five Thousand Dollars ($175,000) shall be payable with respect to such calendar year.

8. Unless this License Agreement is terminated during the first ninety (90) days of the calendar year 1995, the minimum license fee payable with respect to such calendar year shall be the difference between:

(a) One Million Five Hundred Thousand Dollars ($1,500,000), and

(b) the total amount of all license fees paid pursuant to this License Agreement.

D. Notwithstanding the provisions of Sections VIB and VIC, when the total amount of all license fees paid pursuant to this License Agreement with respect to all calendar years equals One Million Five Hundred Thousand Dollars ($1,500,000), then

1. no further license fee shall be owing with respect to the then-current calendar year, and

2. for all calendars years thereafter the annual license fee payable hereunder shall be One Dollar ($1.00) per year.

E. Except with respect to the minimum license fee set forth in Section VIC4, the license fee payable with respect to a calendar year pursuant to Sections VIB and VIC and Section VIDI shall be payable one-half (1/2) within forty-five (45) days, and the remaining one-half (1/2) within one hundred and twenty (120) days, next following the end of such calendar years; provided, however, that if the net profits of Licensee earned during calendar year 1989, 1990, 1992, 1993, or 1994 are less than Three Hundred Fifty Thousand Dollars ($350,000), then

7

1.    such amount of the license fee with respect to such calendar year as is equal to fifty percent (50%) of the net profits of Licensee earned during such calendar year shall be payable one-half (1/2) within forty-five (45) days, and the remaining one-half (1/2) within one hundred twenty (120) days, next following the end of such calendar year, and

2.    the balance of the One Hundred Seventy Five Thousand Dollar ($175,000) minimum license fee payable with respect to such calendar year shall be payable on or before the next following July 31.

The license fee provided in Section VIC4 shall be payable on April 29, 1992, notwithstanding the foregoing provisions of Section VIE. The annual license fee payable with respect to a calendar year pursuant to Section VID2 shall be payable in full within forty-five (45) days next following the end of the calendar year with respect to which such annual license fee is owing.

Notwithstanding the foregoing provisions of this Section VIE or any other provision of this Agreement to the contrary, but subject to the provisions of Section IXC, if this Agreement is terminated for any reason, all license fees owing pursuant to this Agreement shall be immediately due and payable irrespective of any provision of this Agreement allowing for a later payment date.

F.    For purposes of Sections VIB, VIB, and VIG the "net profits" of Licensee shall mean its net profits before income taxes, determined in accordance with generally accepted accounting principles, subject to the following adjustments:

1.    Contributions to qualified or unqualified deferred compensation plans shall not be allowed as deductions to the extent they are paid or accrued or the benefit is determined, based upon the compensation paid or accrued attributable to the Limited Group, as defined in Section VIF2, in excess of such amount of compensation as is equal to the lesser of (i) that allowed pursuant to Section VIF2(b), or (ii) that actually paid or accrued.

2.    No compensation payable to the Limited Group, as defined in this Section VIF2, shall be allowed as deductions except as follows:

(a)    Ian Schaffer's salary and business expenses;

(b)    Up to Seventy-Five Thousand Dollars ($75,000) of annual salary or fees paid or accrued

B

to the Limited Group for time actually devoted to the
affairs of Licensee; and

(c)  The Limited Group's business expenses
relating to Licensee's business affairs which are not
in excess of that which would have been incurred by
an employed executive or other third party who or
which is not a member of the Limited Group (for
example, the expenses relating to any trip of Peter
Brown taken in his private airplane would be for this
purpose limited to an amount equal to the cost of a
commercial airline ticket to such destination).

For purposes of the foregoing, the Seventy-Five
Thousand Dollars ($75,000) payable to the Limited Group
shall be prorated for the calendar year 1988 by
multiplying such amount by a fraction, the numerator of
which shall be the number of days between the date of
execution of this License Agreement and December 31, 1988,
and the denominator of which shall be 365.

The "Limited Group" shall mean all entities, and
employees of Licensee who are not full-time employees,
who or which are shareholders, directors or officers of
Licensee, affiliates of any of the foregoing, employees of
such affiliates, or any of the foregoing individuals' or
entities' families or agents, but shall not include
Jerome V. Lavin or Ellen Lavin.  For purposes of the
foregoing, (i) the term "affiliate" shall mean any entity
with respect to which the person referred to owns at least
five percent (5%) of the equity or voting power, and (ii)
the term "family" shall mean the spouse, parents, and
lineal descendants of the person referred to and the
spouses of all of the foregoing individuals.

3.  The total of all financing costs, including but
not limited to factor fees, bankers' acceptance fees,
letter of credit fees and interest paid or payable to
banks, factors, suppliers and the Limited Group, in excess
of two and four-tenths percent (2.4%) of the net sales
(gross sales less returns and allowances) of Licensee
shall not be allowed as deductions.

The portion of the two and four-tenths percent
(2.4%) limit on total financing costs that is based upon
interest rates may be increased or decreased by the same
percentage that the announced prime or reference rate at
First National Bank of Minneapolis, Minnesota, or its
successor, increases or decreases from that in effect as
of the date of execution of this License Agreement.  The
portion of the two and four-tenths percent (2.4%) limit on
total financing costs that is not based upon interest

9

rates (by way of example, but not limited to, factor service fees, letter of credit openings, amendment and presentation fees, and minimum invoice fees) may not be increased or decreased. Further, interest paid to any member of the Limited Group shall be included only to the extent such interest is paid at a rate not exceeding the rate paid by Buyer to its bank or factor with respect to amounts borrowed by Buyer from such bank or factor.

4. All license fees payable hereunder shall not be allowed as deductions.

5. Costs incurred prior to the date of this License Agreement and costs relating to the creation of Licensee shall not be allowed as deductions.

For purposes of this Section VIF, the net profits of the Licensee shall be determined, with appropriate adjusting entries, as though Licensee's fiscal year is the calendar year, irrespective of Licensee's actual fiscal year.

G. At the time of making each license payment, except those made pursuant to Section VID2, Licensee shall deliver to F & S a statement signed by it's President, and Treasurer or Controller, and verified as accurate, indicating the "Net Profits" of Licensee, and accompanied by financial statements in sufficient detail to verify the calculation of "Net Profits".

H. Any license fee not paid on the date due as provided herein shall accrue interest from the date on which it was due until the date paid at a rate equal to the rate publicly announced by The First National Bank of Minneapolis, as its prime rate, or reference rate, in effect on the date the payment was due. The foregoing shall not preclude F & S from terminating this Agreement pursuant to Section X.

VII. FINANCIAL REPORTS AND BOOKS.

A. Until such time as license fees totalling One Million Five Hundred Thousand Dollars ($1,500,000) have been paid pursuant to this Agreement, Licensee agrees to maintain accurate books of account in accordance with generally accepted accounting practices, and in sufficient detail for F & S to verify the accuracy of the payments specified in Section VI of this Agreement.

B. Until such time as license fees totalling One Million Five Hundred Thousand Dollars ($1,500,000) have been paid pursuant to this Agreement, F & S shall have the right, on reasonable notice and during regular business hours, for a period of three (3) years after each year for which books of account must be maintained pursuant to Section VIIA, above, to examine

10

said books of account and records of Licensee for the purpose of determining whether license fees were accurately calculated and paid in accordance with Section VI of this Agreement.  The rights of examination of this paragraph may be exercised by an officer, employee or other designee of F & S.

C.   If, as a result of an examination pursuant to this Section, it is shown that license fee payments were less than the amount which should have been paid for the period in question, by ten percent (10%) or more, Licensee shall promptly reimburse F & S for the reasonable documented costs of such examination. Any deficiency in license fee payments discovered pursuant to such examination shall be immediately due and payable.

VIII.   SECURITY INTEREST.

A.   Licensee has, or will acquire title to certain trademarks of Gordon & Ferguson Merchandising Company, and any registrations thereof, and Licensee has or will also acquire title to the trade name "Gordon & Ferguson".

B.   Licensee shall execute a Trademark Security Agreement (the "Trademark Security Agreement"), Uniform Commercial Code Financing Statement and Trademark Registration Security Agreement in the form of Exhibits B, C, and D, attached hereto, granting F & S a security interest in the marks, registrations and trade name referenced in Section VIIIA to secure Licensee's payment of license fees in the total amount of One Million Five Hundred Thousand Dollars ($1,500,000) in accordance with Section VI of this Agreement.  Effective on termination of this Agreement for any reason prior to Licensee having paid such One Million Five Hundred Thousand Dollars ($1,500,000) in accordance with Section VI of this Agreement, Licensee hereby appoints F & S, or such individual as is designated by F & S, as its attorney-in-fact to transfer to F & S (i) all Collateral (as defined in the Trademark Security Agreement), and (ii) all trademarks of Licensee utilizing the name "Gordon & Ferguson", except those trademarks relating to apparel; provided, however, that if this License Agreement is terminated by Licensee pursuant to Section IXB or Section XIC after license fees of at least Three Hundred Fifty Thousand Dollars ($350,000) have been paid to F & S pursuant to Section VI, then the trade name "Gordon & Ferguson" and any trademarks utilizing the name "Gordon & Ferguson" shall not be transferred to F & S and Licensee shall retain all rights therein.  This appointment by Licensee of its attorney-in-fact shall be deemed a power coupled with an interest.

IX.   TERM AND TERMINATION.

A.   This Agreement shall continue until terminated pursuant to Section IX, Section X, or Section XIC.

11

B.    This Agreement may be terminated by Licensee within the first ninety (90) days of the calendar years 1989, 1990, 1991, 1992, 1993, 1994, and 1995, by written notice from Licensee to F & S and delivered to F & S as specified in Section XVIB prior to the end of such ninety (90) day period; provided, however, that unless license fees of at least Three Hundred Fifty Thousand Dollars ($350,000) have been paid to F & S pursuant to Section VI, Licensee may not terminate this License Agreement pursuant to this Section IXB without first having transferred to F & S (i) all of the Collateral (as defined in the Trademark Security Agreement), and (ii) all trademarks of Licensee utilizing the name "Gordon & Ferguson", except those trademarks relating to apparel; and further provided, that if license fees in the amount of at least Three Hundred Fifty Thousand Dollars ($350,000) but less than One Million Five Hundred Thousand Dollars ($1,500,000) have been paid pursuant to Section VI, Licensee may not terminate this License Agreement pursuant to this Section IXB without first having transferred to F & S all of the Collateral (as defined in the Trademark Security Agreement) other than the trade name "Gordon & Ferguson".  In the event Licensee has paid license fees pursuant to Section VI in the amount of at least Three Hundred Fifty Thousand Dollars ($350,000), Licensee shall retain all rights to the trade name "Gordon & Ferguson" and to any trademarks of Licensee utilizing the name "Gordon & Ferguson".

C.    Notwithstanding any provision of this Agreement to the contrary, (i) if this License Agreement is terminated by the Licensee during the first ninety (90) days of the calendar year 1989, 1990, 1991, 1992, 1993, 1994 or 1995 as provided in Section IXB, then (a) Licensee shall owe no minimum license fee pursuant to Section VIC for such calendar year or for any future calendar year, (b) Licensee shall owe a license fee for the calendar year in which the Licensee terminated this License Agreement solely in accordance with Section VIB, and (c) Licensee shall owe no license fee for any calendar year subsequent to the calendar year in which Licensee terminated this License Agreement, and (ii) if this License Agreement is terminated by F & S pursuant to Section X or by Licensee pursuant to Section XIC, then (a) Licensee shall owe a minimum license fee pursuant to Section VIC for the calendar year during which this License Agreement is terminated only if such termination occurred subsequent to the first ninety (90) days of such calendar year, (b) Licensee shall owe a license fee for the calendar year during which this License Agreement is terminated in accordance with Section VIB, and (c) Licensee shall owe no license fee for any calendar year subsequent to the calendar year during which this License Agreement is terminated.

Subject to the foregoing provisions of this Section IXC, in the event of termination of this Agreement for any reason, the greater of:

12

1.  the license fee owing pursuant to Section VIB
For the calendar year in which the termination occurs, or

2.  the minimum license fee, if any, owing for the
calendar year in which the termination occurs,

and all unpaid license fees owing for all prior calendar years,
shall remain due and payable and shall be paid, together with any
interest owing thereon as required pursuant to this Agreement.
All provisions of this Agreement relating to the payment of such
amounts shall survive the termination of this Agreement, as shall
the provisions of Sections III, VII, VIII, XI, XII, XIII, XIV and
XVI.  All other provisions of this License Agreement shall
terminate upon termination of this Agreement.

X.   EVENTS OF DEFAULT.

A.   Upon the occurrence of an Event of Default under this
Agreement, F & S shall have the right to terminate this Agreement
upon notice to Licensee, such right of termination being in
addition to any other right or remedy available to F & S at law
or in equity by reason of such default.

B.   The occurrence of any of the following shall be
deemed to be an Event of Default hereunder:

1.  Licensee's failure to make any payment due
hereunder, continued for a period of thirty (30) days
after the giving of notice in writing by F & S.

2.  Licensee's failure to perform, or violation of,
any of the terms, conditions, agreements or covenants of
this Agreement on its part to be performed (other than the
payment of money), or the occurrence of an Event of
Default as described in Section V or Section XII
continued for a period of thirty (30) days after the
giving of notice in writing by F & S specifying such
default, or if such default cannot be cured within such
thirty (30) day period, if Licensee shall not have
commenced to cure the default within the said period and
shall not be proceeding in every way possible to remedy
the default.

3.  The entry of a decree or order by a court having
jurisdiction adjudging Licensee a bankrupt or insolvent,
or approving as properly filed a petition seeking
reorganization, arrangement, adjustment or composition of
or in respect of Licensee under the Federal Bankruptcy Act
or any other applicable Federal or State Law, or
appointing a receiver, liquidator, assignee, trustee,
sequestrator (or other similar official) of Licensee of
any substantial part of its property, or ordering the

13

winding up or liquidation of its affairs, and the
continuation of any such decree or order unstayed and in
effect for a period of sixty (60) consecutive days.

4.   The institution by Licensee of proceedings to be
adjudicated a bankrupt or insolvent, or the consent by it
to the institution of a bankruptcy or insolvency
proceeding against it, or the finding by it of a petition
or answer or consent seeking reorganization or relief
under the Federal Bankruptcy Act or any other applicable
Federal or State Law, or the consent by it to the filing
of any such petition or to the appointment of a receiver,
liquidator, assignee, trustee, sequestrator (or other
similar official) of Licensee of any substantial part of
its property, or the making by it of an assignment for the
benefit of creditors, or the admission by it in writing of
its inability to pay its debts generally as they become
due, or the taking of corporate action by Licensee in
furtherance of any such action.

XI.   INFRINGEMENT.

A.   In the event that Licensee learns of any infringement
or imitation of the Licensed Marks or of any use by any person
of a trademark which has caused confusion, mistake or deception
with respect to the Licensed Marks, in connection with products
licensed under the Licensed Marks, it shall promptly notify F & S
in writing and if in Licensee's reasonable opinion such
infringement, or use also constitutes an infringement of the
rights herein granted to Licensee, Licensee shall specifically so
state in its notice. In such latter case, if action to stop such
believed infringement is not taken by F & S within thirty (30)
days after the date of its receipt of such notice from Licensee,
Licensee shall have the right to prosecute such trademark
infringement at Licensee's sole expense, but in such event
Licensee will keep F & S advised in advance of its intention in
such action, and consult with F & S with respect thereto, and
will not settle such action without F & S's written approval
(which approval shall not be unreasonably withheld). If,
however, F & S does take action, F & S shall permit Licensee to
join such action as an additional plaintiff, at Licensee's own
expense. In either case, F & S and Licensee agree to provide
each other with relevant books, records, papers, information,
designs, samples, specimens, and the like, and shall instruct any
of their respective employees to be deposed or to testify,
whenever requested to do so by either of them, and to cooperate
fully with the party conducting the action. If such infringement
infringes upon the rights herein granted to Licensee, any
recovery obtained against the third party infringer shall be
applied first on a pro rata basis toward the legal fees and
expenses incurred by F & S and Licensee in such action and then
shall be allocated between  F & S and Licensee as if such

14

recovery were additional sales of Licensed Products under this Agreement; that is, F & S would be entitled to the applicable license fee set forth in this Agreement on additional Net Profits (when added to the actual Net Profits of Licensee for the year of the recovery) of Licensee from said increased sales and the balance would be retained by Licensee. This allocation of recovery shall apply to settlements, judgments or decisions, the parties agreeing to apply for any court judgments or decision on such basis; provided, however, that the parties agree to be bound by any actual different allocation of a court judgment or decision.

B. Subject to (i) Section 21.2.2 of that certain Agreement (the "Purchase Agreement") dated October 28, 1988, by and between Gordon & Ferguson Company, Gordon & Ferguson Merchandising Company, Gordon & Ferguson Sales Corporation, F & S, Jerome V. Lavin, Ellen Lavin, Licensee, Peter Damon Brown, Leonard Rubin and Daniel Rubin, providing for, among other things, the sale of assets by Gordon & Ferguson Merchandising Company, Gordon & Ferguson Sales Corporation and Gordon & Ferguson Company to Licensee and the execution of this License Agreement, and (ii) Licensee's compliance with Section XI.C, F & S hereby covenants and agrees to indemnify Licensee, its officers, directors and shareholders, and the Guarantors (as defined in the Purchase Agreement), with respect to (1) any and all damages, losses, reasonable expenses and costs (including, without limitation, reasonable attorneys' fees and disbursements), obligations and liabilities suffered, sustained, incurred or required to be paid by any such indemnified party due to claims by third parties that the use of the Licensed Marks infringes upon the rights of such third parties, and (2) any breach by F & S of its warranties made hereunder or any violation by F & S of any of its covenants hereunder. Until license fees of at least One Million Five Hundred Dollars ($1,500,000) have been paid pursuant to Section VI of this License Agreement, F & S shall defend and hold Licensee and its officers, directors and shareholders and the Guarantors harmless with respect to any lawsuit brought by a third party wherein the only allegation made in such lawsuit is to the effect that the use of the Licensed Marks by Licensee infringes upon such third party's rights. F & S shall have no obligation to defend Licensee and its officers, directors and shareholders and the Guarantors with respect to any lawsuit brought by a third party wherein such lawsuit contains any allegation in addition to the aforesaid allegation.

C. If any third party institutes any action against Licensee, or its officers, directors or shareholders or the Guarantors, or makes any claim against Licensee, or its officers, directors or shareholders or the Guarantors, which might give rise to a claim by an indemnified party against F & S, Licensee, or its officers, directors or shareholders or the Guarantors,

15

shall promptly notify F & S thereof.  In the event that following notification by Licensee or other indemnified parties to F & S of any such third-party claim, no action is taken by F & S to oppose such claim within thirty (30) days after the date of its receipt of such notice from Licensee or the other indemnified parties, Licensee shall have the right, at its own expense (except as provided in the last two sentences of Section XIB), to conduct the defense of such litigation, but in such event Licensee will keep F & S advised in advance of its intention in such action, will consult with F & S with respect thereto, and will not settle such action without F & S's written approval (which approval shall not be unreasonably withheld); provided, however, that the failure of a F & S to conduct the defense of an indemnified party shall not relieve F & S from its obligation to indemnify provided in this Section XIB.  In either case, F & S and Licensee agree to cooperate fully with the party defending the action as provided in Section XIA above.  Any recovery obtained against the third party bringing the claim for wrongful litigation or otherwise shall be applied first toward the legal fees and expenses incurred in connection with such action in the manner set forth in Section XIA and the balance thereof shall then be allocated between F & S and Licensee as set forth in Section XIA above.

In the event that the third party bringing such action of trademark infringement against Licensee and/or other indemnified parties is successful and the action results in a final judgment or permanent injunction from which no appeal can be taken, which requires Licensee to cease the use of any of the Licensed Marks in connection with the Licensed Products, then Licensee shall have the right to terminate this License Agreement, and in such event F & S shall remain fully liable to indemnify Licensee and the other indemnified parties as set forth in Section XIB above; provided, however, that unless license fees of at least Three Hundred Fifty Thousand Dollars ($350,000) have been paid to F & S pursuant to Section VI, Licensee may not terminate this License Agreement pursuant to this Section XIC without first having transferred to F & S (i) all of the Collateral (as defined in the Trademark Security Agreement); and (ii) all trademarks of Licensee utilizing the name "Gordon & Ferguson", except those trademarks relating to apparel; and further provided, that if license fees in the amount of at least Three Hundred Fifty Thousand Dollars ($350,000) but less than One Million Five Hundred Thousand Dollars ($1,500,000) have been paid pursuant to Section VI, Licensee may not terminate this License Agreement pursuant to this Section XIC without first having transferred to F & S all of the Collateral (as defined in the Trademark Security Agreement) other than the trade name "Gordon & Ferguson".  In the event Licensee has paid license fees pursuant to Section VI in the amount of at least Three Hundred Fifty Thousand Dollars ($350,000), Licensee shall retain all rights to the trade name "Gordon & Ferguson" and to any trademarks of Licensee utilizing the name "Gordon & Ferguson".

16

Notwithstanding any other provision of this Agreement, Licensee may withhold and offset (i) license fees otherwise accrued or payable to F & S under this Agreement, and (ii) any amounts payable to F & S and/or Sellers under the Purchase Agreement, other than with respect to amounts payable pursuant to Section 6 of the Purchase Agreement and amounts payable pursuant to the Sublease (as defined in the Purchase Agreement), to cover the indemnification obligations of F & S set forth in this Section XI or to cover the indemnification obligations of F & S and Sellers under Section 21.2 of the Purchase Agreement, but only after F & S's obligation to indemnify any indemnified party hereunder or F & S's and Sellers' obligations to indemnify under the Purchase Agreement has been established by (a) final court judgment, (b) the settlement of a claim made by a third party where the indemnifying party has agreed in writing to such settlement (the agreement of the indemnifying party not to be unreasonably withheld), (c) Licensee having submitted to the indemnifying party documentation to establish the reasonableness of the indemnified parties' out-of-pocket expenditures and the indemnifyingarty's liability therefor with respect to matters not involving third-party claims, or (d) the agreement of the parties with respect to which the indemnifying party has also agreed as provided in the first paragraph of this Section XIC or Section 21.3 of the Purchase Agreement.

D.    F & S shall, at its own expense, maintain and protect Federal Registrations for the Licensed Marks to enable the Licensed Products to be distributed and sold as provided herein. Should F & S fail to fulfill the aforesaid obligations, Licensee may (but is under no obligation to), at its option, and at the expense of F & S, maintain and protect the registration status of Federal Registrations, and F & S shall cooperate with Licensee in connection therewith.

XII. ASSIGNMENT

A.    The rights of F & S under this Agreement are freely transferable by F & S by assignment, or otherwise.

B.    Licensee may not assign, sublicense, or otherwise transfer any rights or permit any use of the Licensed Marks, or any trademark or registration subject to a security interest under Section VIII without the prior written consent of F & S, nor may Licensee further encumber the trademarks or registrations referred to in Section VIII, unless and until the license fees set forth in Section VI in the amount of One Million Five Hundred Thousand Dollars ($1,500,000) have been paid. All sales and profits of Licensee resulting from the use of any trademarks or registrations subject to a security interest under Section VIII, or resulting from any other activity of Licensee, shall be included in "Net Profits" of Licensee for purposes of calculating the license fee due hereunder.

17

C.    Any assignment, sublicense or other transfer of Licensee's rights under this Agreement, or any attempt to do so, prior to payment of the license fees set forth in XIIB, above, shall be void, and any such attempt shall be an Event of Default under the terms of this Agreement.

XIII.    RIGHTS RESERVED TO F & S.

A.    Subject to the rights of Licensee under this Agreement, F & S has the absolute right to sell, transfer, assign, encumber, use and license the Licensed Marks for any and all products other than those set forth in Section I, GRANT, of this Agreement.  Notwithstanding the foregoing, however, F & S agrees to notify Licensee in writing in accordance with Section XVID prior to any voluntary transfer by F. & S of any of the Licensed Marks to any third party who or which is not an officer, director or shareholder of F & S, an affiliate of F & S, a shareholder of any affiliate of F & S, or a family member of any of the foregoing individuals, or for the benefit of any of the foregoing individuals or entities.  For purposes of the foregoing, the terms "affiliate" and "family" shall be defined as provided in Section VIF2.

B.    All rights not specifically granted on an exclusive basis under this Agreement are reserved for F & S.

C.    F & S shall have the right to pursue additional Registrations of existing or new products under the Licensed Marks anywhere in the world, including the right to take any and all action necessary to pursue and support the issuance of such new Registrations.  Licensee hereby consents to any such action or activities.  Any new Registrations obtained by F & S shall be deemed "Licensed Registrations" for purposes of Section X of this Agreement.

D.    F & S shall have the right to advertise and promote the Licensed Marks on any and all products, including the products licensed under this Agreement.  Licensee agrees, to the best of its ability, to provide reasonable quantities of products using the Licensed Marks to F & S for the advertising, public relations and promotion of the Licensed Marks, at Licensee's lowest wholesale selling price.  F & S may use the Licensed Marks on the products licensed under this Agreement, if Licensee cannot supply such products, but only for the purposes set forth in this Section.

XIV.    USE AS TRADE NAMES.

Licensee may do business under the trade names "Field & Stream° Outerwear", "Field and Stream° Outerwear", "Town & Country° Outerwear", and/or "Town and Country° Outerwear", and in connection therewith shall be entitled to register said names as

18

trade names or fictitious names under the relevant corporate statutes of any jurisdiction in which such registration is required. Upon termination of this License Agreement for any reason whatsoever, Licensee shall promptly take all necessary actions to cancel all such registrations. In order to insure such cancellations upon termination of this License Agreement, Licensee hereby irrevocably constitutes and appoints F & S its true and lawful attorney-in-fact, with F & S having full power and authority in Licensee's name, place and stead to execute, acknowledge, deliver, swear to, certify, verify, publish, file and record at the appropriate public offices, such certificates, instruments and documents as may be necessary to cancel such trade name and fictitious name registrations. This appointment by Licensee of F & S as attorney-in-fact shall be deemed a power coupled with an interest. The foregoing shall not prevent F & S from utilizing the Licensed Marks other than with respect to Outerwear (as defined in Section IB) as trade names or as fictitious names, or from licensing the Licensed Marks to others, other than as prohibited by Section I, and authorizing any such Licensee to utilize the Licensed Marks other than with respect to Outerwear as trade names or as fictitious names.

## XV.   FURTHER DOCUMENTS.

F & S and Licensee agree that, at any time and from time to time after the date hereof, they will, upon the request and at the expense of the requesting party, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered, all such further acts, documents or assurances as may be required to carry forward the purposes of this Agreement.

## XVI.   MISCELLANEOUS.

A.   Nothing herein contained shall be construed to place the parties in relationship of partners or joint ventures.

B.   Neither Licensee nor F & S shall represent itself as the agent or legal representative of the other for any purpose whatsoever and neither shall have the right to create or assume any obligations of any kind, express or implied, for or on behalf of the other, except as specifically provided for in this Agreement.

C.   Except to the extent F & S has agreed to indemnify Licensee, its officers, directors and shareholders, and Guarantors (as defined in the Purchase Agreement) pursuant to Section XI, but subject to Section 21 of the Purchase Agreement, Licensee shall indemnify P & S, Sellers (as defined in the Purchase Agreement), their respective shareholders, officers and directors, and Jerome V. Lavin and Ellen Lavin, of and from any and all liability, claims, causes of action, suits, damages and expenses (including reasonable attorney's fees and expenses),

19

for which they or any of them may become liable or may incur or be compelled to pay in any action or claim against them or any of them, for or by reason of any acts, whether of omission or commission, that may be committed or suffered by Licensee or any of its servants, agents or employees in connection with Licensee's performance of this Agreement, including, but not limited to, the sale of Licensed Products. Licensee agrees to include F & S as an additional insured with respect to its products liability insurance, and to supply F & S with a certificate of their insurance in the amount of not less than Two Million Dollars ($2,000,000). Nothing in this Section XVIC shall reduce F & S's or the Sellers' (as defined in the Purchase Agreement) representations, warranties or obligations pursuant to the Purchase Agreement, including, without limitation, indemnification obligations under Section 21.2 of the Purchase Agreement. Furthermore, this Section XVIC shall be inapplicable to the extent that as to such matter, Sellers and F & S are required to indemnify Licensee pursuant to Section 21.2 of the Purchase Agreement.

D.   NOTICES.  Any notice or other communication required or permitted hereunder shall be in writing and shall be deemed to have been given if personally delivered or if placed in the United States Mail, registered or certified, postage prepaid, addressed as follows:

1. If to F & S:

Field & Stream Licenses Company
14 Loring Road
Hopkins, Minnesota 55343

and to:

Howard J. Kauffman, Esq.
Lindquist & Vennum
4200 IDS Center
Minneapolis, Minnesota 55402

2. If to Licensee:

Gordon & Ferguson of Delaware, Inc.
2915 Niagara Lane
Plymouth, Minnesota  55447

and to:

Michael Heitner, Esq.
Herrick, Feinstein
2 Park Avenue
New York, New York  10016

20

Each of the foregoing shall be entitled to specify a different address by giving notice as provided above to the other.

E.   ENTIRE AGREEMENT; MODIFICATION; WAIVERS.

This Agreement constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof and supercedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties, and there are no warranties, representations or agreement among the parties in connection with the subject matter hereof, except as set forth or referred to herein.  No supplement, modification or waiver or termination of this Agreement or any provision hereof shall be binding unless executed in writing by the parties to be bound. No waiver of any of the provisions of this Agreement shall constitute a waiver of any other provision nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

F.   HEADINGS.  Section and subsection headings are not to be considered part of this Agreement and are included solely for convenience and are not intended to be full or accurate descriptions of the content thereof.

G.   EXHIBITS.  Exhibits referred to in this Agreement are an integral part of this Agreement and are hereby incorporated by reference into this Agreement.

H.   SUCCESSORS AND ASSIGNS.  Subject to Section XII, all of the terms and provisions of this Agreement will be binding upon and shall inure to the benefit of the parties hereto and their respective transferees, successors and assigns.

I.   GOVERNING LAW.  The parties hereby agree that this Agreement has been executed in the State of Minnesota and shall be governed by the laws of said State.

J.   PARTIES IN INTEREST.  Subject to Section IIIP and Section XII, nothing in this Agreement is intended to confer upon any persons other than the parties hereto and their respective successors and assigns any rights or remedies under or by reason of this Agreement, nor is anything in this Agreement intended to relieve or discharge the liability of any other party, nor shall any provision hereof give any entity any right of subrogation against or action against any party to this Agreement.

K.   COUNTERPARTS.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

21

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be entered into on the day and year first above written.

FIELD & STREAM LICENSES COMPANY

By _____

Its _____

GORDON & FERGUSON OF DELAWARE, INC.

By _____

Its _____

22

**GORDON & FERGUSON MERCHANDISING COMPANY**
**FIELD & STREAM, TOWN & COUNTRY AND RELATED**
**U.S. AND FOREIGN TRADEMARKS**

| COUNTRY | MARK | SERIAL NO. | REG. NO. | FILING DATE OR REG. DATE |
|---------|------|-----------|----------|--------------------------|
| U.S.A. | FIELD & STREAM | | 1,360,646 | 09/17/85 |
| U.S.A. | TOWN & COUNTRY | | 1,294,418 | 09/11/84 |
| U.S.A. | FIELD AND STREAM | | 1,360,645 | 09/17/85 |
| U.S.A. | TOWN AND COUNTRY | | 1,291,158 | 08/21/84 |
| U.S.A. | FIELD AND STREAM | | 1,375,862 | 12/17/85 |
| U.S.A. | FIELD & STREAM | | 740,945 | 11/20/62 |
| U.S.A. | TOWN & COUNTRY | | 410,033 | 11/07/44 |
| U.S.A. | TOWN & COUNTRY | | 815,898 | 09/27/66 |
| U.S.A. | TOWN & COUNTRY | | 177,556 | 12/18/23 |
| U.S.A. | FIELD AND STREAM | | 217,643 | 09/07/26 |
| U.S.A. | FIELD & STREAM | 535,208 | | 05/01/85 |
| U.S.A. | FIELD & STREAM | 535,210 | | 05/01/85 |
| CANADA | FIELD & STREAM | | 307,681 | 10/25/85 |
| CANADA | FIELD AND STREAM | | 307,782 | 10/25/85 |
| JAPAN | FIELDSTREAM | | 1758878 | 04/23/85 |
| JAPAN | FIELDSTREAM | | 1819498 | 11/29/85 |

REEL 0566 FRAME 936

TRADE-MARK

EXHIBIT A

RECORDED
PATENT & TRADEMARK OFFICE

JUN 29 1987

# Exhibit B

Int. Cl.: 25

Prior U.S. Cl.: 39

## United States Patent and Trademark Office

Reg. No. 1,360,645
Registered Sep. 17, 1985

### TRADEMARK
### PRINCIPAL REGISTER

## FIELD AND STREAM

GORDON & FERGUSON MERCHANDISING COMPANY (MINNESOTA CORPORATION) 701 STINSON BOULEVARD, N.E. MINNEAPOLIS, MN 55413 , BY ASSIGNMENT FROM GORDON AND FERGUSON COMPANY (MINNESOTA CORPORATION) MINNEAPOLIS, MN 55413

FOR: CLOTHING AND ACCESSORIES FOR MEN, WOMEN AND CHILDREN; NAMELY JACKETS, COATS, BLOUSES, SHIRTS, PANTS,

SHORTS, SWEATERS, SKI PANTS, SKI BIBS, HATS, CAPS, GLOVES, MITTENS, UNDERWEAR, VESTS, SCARVES, AND TIES, IN CLASS 25 (U.S. CL. 39).

FIRST USE 9-1-1915; IN COMMERCE 9-1-1915.

SER. NO. 333,390, FILED 10-20-1981.

DAVID E. BUCHER, EXAMINING ATTORNEY

Int. Cl.: 25

Prior U.S. Cl.: 39

## United States Patent and Trademark Office

Reg. No. 1,360,646
Registered Sep. 17, 1985

## TRADEMARK
### PRINCIPAL REGISTER

## FIELD & STREAM

GORDON & FERGUSON MERCHANDISING COMPANY (MINNESOTA CORPORATION)
701 STINSON BLVD., N.E.
MINNEAPOLIS, MN 55413 , ASSIGNEE OF GORDON & FERGUSON COMPANY (MINNE-SOTA CORPORATION) MINNEAPOLIS, MN 55413

· FOR: CLOTHING AND ACCESSORIES FOR MEN, WOMEN AND CHILDREN; NAMELY JACKETS, COATS, BLOUSES, SHIRTS, PANTS, SHORTS, SWEATERS, SKI PANTS, SKI BIBS, HATS, CAPS, GLOVES, MITTENS, UNDER-WEAR, VESTS, SCARVES, AND TIES, IN CLASS 25 (U.S. CL. 39).

FIRST USE 9–1–1915; IN COMMERCE · 9–1–1915.

SER. NO. 333,392, FILED 10–20–1981.

DAVID E. BUCHER, EXAMINING ATTORNEY

Int. Cl.: 18

Prior U.S. Cl.: 3

## United States Patent and Trademark Office

Reg. No. 1,375,862
Registered Dec. 17, 1985

## TRADEMARK
### PRINCIPAL REGISTER

## FIELD AND STREAM

GORDON & FERGUSON MERCHANDISING
COMPANY (MINNESOTA CORPORATION)
701 STINSON BLVD., N.E.
MINNEAPOLIS, MN 55413

FOR: BACKPACKS FOR USE OTHER THAN
DURING OUTDOOR SPORTS ACTIVITIES
AND LUGGAGE, IN CLASS 18 (U.S. CL. 3).

FIRST USE 0-0-1915; IN COMMERCE
12-11-1982.
OWNER OF U.S. REG. NO. 217,643.

SER. NO. 412,209, FILED 2-4-1983.

MICHELE L. MCSHANE, EXAMINING ATTOR-
NEY

# United States Patent Office

**740,945**
Registered Nov. 20, 1962

## PRINCIPAL REGISTER
### Trademark

Ser. No. 109,409, filed Dec. 1, 1960

## FIELD & STREAM

Gordon & Ferguson Co. (Minnesota corporation)
230 E. 5th St.
St. Paul 1, Minn., assignee of
Gordon & Ferguson, Inc. (Minnesota corporation)
St. Paul, Minn.

For: JACKETS, COATS, BLOUSES, SHIRTS, PANTS AND SHORTS FOR MEN, WOMEN, AND CHILDREN, AND SKIRTS AND SUITS FOR WOMEN AND GIRLS, in CLASS 39.
First use Sept. 1, 1915; in commerce Sept. 1, 1915.
Owner of Reg. No. 217,643.

Registered Sept. 7, 1926.                    Trade-Mark 217,643

# UNITED STATES PATENT OFFICE.

GORDON & FERGUSON, INC., OF ST. PAUL, MINNESOTA.

ACT OF FEBRUARY 20, 1905.

Application filed May 15, 1926. Serial No. 231,668.

# FIELD AND STREAM

## STATEMENT.

To the Commissioner of Patents:

Gordon & Ferguson, Inc., a corporation duly organized under the laws of the State of Delaware, and located in the city of St. Paul, county of Ramsey, in the State of Minnesota, and doing business on Sibley Street between Fourth and Fifth Streets, in the city of St. Paul, State of Minnesota, has adopted and used the trade-mark shown in the accompanying drawing, for LEATHER BLOUSES, LEATHER VESTS, SHEEP-LINED JACKETS, AND SHEEP-LINED COATS, in Class 39, Clothing, and presents herewith five specimens showing the trade-mark as actually used by applicant upon the goods and requests that the same be registered in the United States Patent Office in accordance with the act of February 20, 1905, as amended.

The trade-mark has been continuously used and applied to said goods in applicant's business since on or about Sept. 1, 1915.

The trade-mark is applied or affixed to the goods by attaching thereto a woven label on which the trade-mark is shown.

The undersigned hereby appoints Bradbury & Caswell (composed of the members F. G. Bradbury and F. C. Caswell), 533 Metropolitan Bank Building, Minneapolis, Minnesota, its attorneys, to prosecute this application for registration, with full powers of substitution and revocation, and to make alterations and amendments therein, to receive the certificate, and to transact all business in the Patent Office connected therewith.

GORDON & FERGUSON, INC.,
By J. M. HANNAFORD, Jr.,
Secretary.

# Exhibit C



March 13, 2006

Mr. Ian Schaffer
Gordon & Ferguson of Delaware, Inc.
2915 Niagara Lane
Plymouth, MN. 55447

Dear Ian

I have had the pleasure of re reading our 1988 Agreements.

With respect to assignment and transfer, I call your attention to

Paragraph  XII. ASSIGNMENT

Para B. makes clear that you do not need any consent from FSLC for an assignment, sublicense or other transfer of the License Agreement if "….the license fees set forth in Section VI in the amount of One Million Five Hundred Thousand Dollars ($1,500,000) have been paid.

By this letter I confirm to you that all license fees required under Section VI. Totaling $1,500,000 have been paid.

It is therefore our belief that no consent of any kind is required for your transfer of the License Agreement.

FIELD & STREAM LICENSES COMPANY

Jerome V. (Jerry) Lavin
President

FIELD & STREAM LICENSES COMPANY
• P.O. Box 47366 Plymouth, MN 55447 USA •
• 9909 South Shore Drive, Plymouth, MN ·55441 · Tel: 763-557-8888 · Fax: 763-512-1002 •
• Web: fieldandstreamlicenses.com • E-mail: jerryL@fands.com •

## NOTE

Ian, if you want anything more, I will have to go thru all these papers, and search to see what, if any other papers we have, that deal with your and my agreements or understandings under the Agreement.

If you want that I will put them down on paper.  I would think that is more confusing to your buyer than just the above, but it is up to your attorney.

If he wants to speak with me, I am here.

Jerry

FIELD & STREAM LICENSES COMPANY
• P.O. Box 47366 Plymouth, MN 55447  USA •
• 9909 South Shore Drive, Plymouth, MN  55441 • Tel: 763-557-8888 • Fax: 763-512-1002 •
• Web: fieldandstreamlicenses.com • E-mail: JerryL@fands.com •

# Exhibit D

Citi - Check Images

https://o9863614.da-us.citibank.com/HomeBankingSecure/insess.as...

**CHECK 1016**

· print · close

**Date:** 01/31/2007

**Amount:** $ 1.00

magnify

| | |
|---|---|
| GORDON & FERGUSON, INC. | citibank   CITIBANK, N.A. BR. 3000   THE HARBORSIDE AVENUE   NEW YORK, NY 10011   001016 |
| 56 WEST 40TH STREET   NEW YORK, NY 10018 | 1-8/210 |
| | 1/10/2007 |

530117612 102 4104 21 013107

PAY    FIELD & STREAM HOLDINGS, LLC.                              **1.00

One and 00/100*                                          DATE      AMOUNT

TO THE    FIELD & STREAM HOLDINGS, LLC.
ORDER    18 Kings Hwy North,
OF         Westport, CT 06880

License Fee

⑈00101⑊⑈ ⑉021000089⑈744461⑊6⑈ ⑈0000000100⑈

magnify

PAID CITIBANK
GCPO #653
4104 530117612 013107

ENDORSE HERE

CREDITED TO THE ACCOUNT OF
THE WITHIN NAMED PAYEE
ABSENCE OF ENDORSEMENT GUARANTEED
BANK OF AMERICA
WESTPORT OFFICE, WESTPORT CO.

5379279009

**Security Tip:** Check Image files may be automatically saved on the hard drive of this computer. If other people use this computer you should delete these files so that no one will have access to your check images and account information. <u>Learn more</u>

3/16/07 4:40 PM

Citi - Check Images                                    https://o9o03c9c14.ua-us.citibank.com/HomeBankingSecure/nsess.us...

# CHECK 1016

Copyright © 2007 Citigroup Inc.

# Exhibit E



SANDDEEP CHATRATH*
* Admitted in N.Y. and MA

The
CHATRATH
Law Firm, P.C.

OF COUNSEL
GARY S. PASRICHA*
* Admitted in N.Y. and N.J.

494 EIGHTH AVENUE, SUITE 505 · NEW YORK, NEW YORK 10001
(212) 268-2920 · Facsimile (212) 268-2921
E-Mail Law@ChatrathLaw.com

NEW JERSEY OFFICE
ONE WOODBRIDGE CENTER
WOODBRIDGE, NEW JERSEY 07095

June 11, 2007

Field & Stream Holdings, LLC
18 Kings Highway North
Westport, Connecticut 06880

Brown Rudnick Berlack Israels LLP
Seven Times Square
New York, New York 10036

**Attention: Mike Tewey**

**Attention: Alan Forman, Esq.**

Re:   Gordon & Ferguson, Inc. and G&F Licensing Corporation

Dear Sirs:

Please be advised that I represent G&F Licensing Corporation.   The license agreement between Field & Stream Licenses Company and Gordon & Ferguson of Delaware, Inc., as same was transferred to Gordon & Ferguson, Inc., has been assigned to G&F Licensing Corporation.

As such please forward all future notices and/or correspondence to:

G&F Licensing Corporation
58 West 40th Street, 12th Floor
New York , New York 10018
Fax: (212) 378-5525

With a copy to:

The Chatrath law Firm, P.C.
494 Eighth Avenue, Suite 505
New York, New York 10001
Fax: (212) 268-2921

If you have any questions regarding the above, please do not hesitate to contact the undersigned.

Very truly yours,
THE CHATRATH LAW FIRM, P.C.

By: Sanddeep Chatrath

SC/og

# Exhibit F



ALAN N. FORMAN
Counselor at Law
direct dial: 212.209.4812
aforman@brownrudnick.com

Seven
Times
Square
New York
New York
10036
tel 212.209.4800
fax 212.209.4801

July 18, 2007

<u>**VIA CERTIFIED MAIL and FACSIMILE TRANSMISSION**</u>

Gordon & Ferguson of Delaware, Inc.
2915 Niagara Lane
Plymouth, MN 55447

Herrick, Feinstein
2 Park Avenue
New York, NY 10016
Attention: Michael Heitner, Esq.

                    Re:    **Field & Stream**

Gentlemen:

        Reference is hereby made to that certain License Agreement (the "Agreement") dated as of October 28, 1988 between Field & Stream Licenses Company ("F&S") and Gordon & Ferguson of Delaware, Inc. ("Licensee"), pursuant to which certain trademarks (the "Marks") were licensed by F&S to Licensee. We are writing to you on behalf of our client, and understand that you have engaged Jassin-O'Rourke Group, LLC to assist you with the marketing, assignment and sale of your rights under the Agreement. In connection with that potential sale, we have been requested to advise you as to certain limitations under the Agreement.

        As you know from your meetings with Mike Tewey, the President of F&S, F&S was purchased about a year ago by an investor group specifically to enhance and re-launch the Field & Stream brand. In combination with a long history of brand development, the new owners have devoted significant capital to hire a premier branding firm, to engage a cutting edge, interactive web site developer, and to develop a detailed long term brand development plan. As a result, management is now executing on its vision to re-position the brand by expanding the presence of Field & Stream products at upscale retailers. For your consideration, we enclose a copy of the new F&S brand book.

        It is against this background that we write to you to clarify certain matters addressed by the terms and conditions of the Agreement (including certain letter agreements between F&S and the Licensee).

        It should be noted that the Licensee's Right of First Refusal (Section IV of the Agreement) to license the Marks for certain sportswear products has been waived by Licensee. (See the letter dated March 21, 2001 signed by Ian Schaeffer as President and CEO of Licensee confirming the



waiver of these rights.) Similarly, Licensee has confirmed that "workwear" is not considered a Licensed Product under the Agreement (See the letter dated August 2, 2004). Finally, given the wide variety of fabrics that are presently water resistant, F&S construes broadly the "rainwear" exclusion to the definition of outerwear set forth in Section I B. of the Agreement.

In addition to the contractual limitations pertaining to "outerwear", we intend to take all steps necessary and appropriate to vigorously enforce our rights under the Agreement – to protect the value and integrity of the Field & Stream brand. Section V of the Agreement clearly and unambiguously requires the Licensee to "...use the Licensed Marks in a manner which will preserve and protect the reputation and prestige of F&S and the Licensed Marks". In our opinion, this broadly worded language requires a licensee to produce high quality goods that are tastefully promoted and sold through prestigious retailers. Accordingly, our client intends to inspect the manufacturing facilities from which Licensed Products are sourced, and to periodically require that samples of proposed Licensed Products be submitted to F&S (or its designee) for quality assurance purposes. (See Section 5.B. of the Agreement). Since F&S has made major strides to improve the reputation and prestige of the F&S brand, F & S expects that the quality of the Licensed Products to be of a commensurate level.

With this in mind, F & S hereby requests that you promptly provide it with (i) the name(s), addresses and contact information for each manufacturer through which you source Licensed Products, and (ii) samples of each Licensed Product currently sold or proposed to be sold.

Now that you are well aware of F&S' ongoing re-launch and upgrade of its famous brand, we trust that you will notify potential assignees as to our commitment to ensure brand integrity. It should also be known that F&S will absolutely require that the Marks be appropriately protected and that F & S is willing to pursue all available legal remedies to protect its very valuable asset. Make no mistake, in light of the potential harm to the reputation of F&S and the prestige of the Marks, sales of Licensed Products in discount or other mass merchants will not be tolerated.

If we have been unclear or you have any questions, please do not hesitate to contact the undersigned.

Very truly yours,

Alan N. Forman

cc:   Larry Martin, Chief Executive Officer
      Michael Tewey, President
      Field & Stream License Company, LLC

# Exhibit G



SANDDEEP CHATRATH*
* Admitted in N.Y. and MA

The
CHATRATH
Law Firm, P.C.

OF COUNSEL
GARY S. PASRUCHA*
* Admitted in N.Y. and N.J.

NEW JERSEY OFFICE
ONE WOODBRIDGE CENTER
WOODBRIDGE, NEW JERSEY 07095

494 EIGHTH AVENUE, SUITE 505 · NEW YORK, NEW YORK 10001
(212) 268-2920 · Facsimile (212) 268-2921
E-Mail Law@ChatrathLaw.com

August 16, 2007

**VIA CERTIFIED MAIL AND FACSIMILE 212-209-4801**
Brown Rudnick
Seven Times Square
New York, New York 10036

**Attention: Alan N. Forman, Esq.**

Re:     Field & Stream and G&F Licensing Corporation

Dear Mr. Forman:

As I advised you by my correspondence dated June 11, 2007, I represent G&F Licensing Corporation. It appears however, that you have not had an opportunity to change the address for both the current licensee or to note my office's representation, and I would request that you do so.

I have been given a copy of your July 18, 2007, correspondence, and initially would like to apologize for this delayed response. Certain personal emergency situations prevented me from responding sooner. Unfortunately, given that the actual correspondence did not reach the addresses set forth in my June 11, 2007, letter, I did not receive a copy of the Field & Stream Licenses Company (F&S) handbook that you reference, nor do I have the August 2, 2004 correspondence and I would ask you to forward same to me at your earliest convenience.

Having reviewed the license agreement (the "Agreement") between Field & Stream Licenses Company (F&S) and Gordon & Ferguson of Delaware, Inc., as transferred to Gordon & Ferguson, Inc., and assigned to G&F Licensing Corporation ("Licensee"), I am concerned about the limitations you assert in your correspondence as these do not coincide with the Agreement. In fact, the tenor of your letter intimates that your client is set on infringing my client's exclusive rights under the Agreement to manufacture and sell outerwear as clearly defined, not limited, in the Agreement, your erroneous position with regard to a "new definition" of rainwear notwithstanding.

Your letter asserts that you write to "advise" Licensee of certain limitations and to "clarify" certain terms of the Agreement. In fact, you seek to make unilateral changes to the



Alan N. Forman, Esq.
August 16, 2007
Page 2 of 3

Agreement. This F&S can not do.

I write to respond to four points in particular:

1.  <u>Right of First Refusal (Section IV of the Agreement)</u>.  Please send me a copy of the executed license agreement entered into after the Licensee purportedly exercised its right of first refusal under Section IV.  Once we have had an opportunity to review it, we will respond to the assertion in your letter.

2.  <u>"Workwear."</u>  Please send me a copy of the letter dated August 2, 2004 that you reference in your letter.  Once we have had an opportunity to review it, we will respond to the assertion in your letter.

3.  <u>"Rainwear."</u>  You assert that "given the wide variety of fabrics that are presently water resistant, F&S construes broadly the "rainwear" exclusion to the definition of outerwear set forth in Section I B. of the Agreement."  Any sale by F&S, or license by F&S of rights to third parties to sell, water resistant Outerwear under the Licensed Marks (as defined in the Agreement) will infringe Licensee's rights under the Agreement.  The Agreement defines Licensed Products, to which  Licensee has exclusive rights, to mean Outerwear, i.e., coats, jackets, blousons, vests, anoraks, parkas, ski jackets, ski bibs and ski pants, excluding apparel not designed and/or sold for active use in hunting or fishing.  "Outerwear" includes any coat, jacket, blouson, vest, anorak, parka, ski jacket, ski bib or ski pants sold in a department store outerwear department (excluding any such items designed and/or sold for active use in hunting or fishing).  The Licensee has exclusive rights to Outerwear as so defined—whether or not water resistant.  Outerwear does not include rainwear.  (Rainwear is not sold in department store outerwear departments.)  That an item is water resistant does not make it rainwear.

4.  <u>"Upgrade" and "Reposition" of Brand; Sales to discount or mass merchants</u>.  Licensee has complied and will continue to comply with the quality standards defined in Section V of the Agreement.  The Agreement does not specify or limit the channels of distribution, and for years Licensee and its predecessors have sold Licensed Products through various retail chains.  Any effort by F&S unilaterally to change those standards or terms interferes with Licensee's contractual rights.



*Alan N. Forman, Esq.*
*August 16, 2007*
*Page 3 of 3*

Licensee acknowledges that F&S has the right under the Agreement to make reasonable inspections of the facilities where the Licensed Products are being manufactured and to obtain periodic samples for the purpose of ensuring compliance with the standards defined in Section V of the Agreement. We will provide the requested information and samples.

Licensee is pleased to learn of F&S' re-dedication to and investment in the Licensed Marks, which should be to the mutual benefit of both F&S and Licensee.   Just as F&S intends vigorously to enforce its rights under the Agreement and protect the value and integrity of the Licensed Marks, so does Licensee intend vigorously to enforce its valuable rights under the Agreement and protect its interest in the Liensed Marks.

If you have any questions regarding the above, please do not hesitate to contact the undersigned.

Very truly yours,
THE CHATRATH LAW FIRM, P.C.

By: Sanddeep Chatrath

SC/og

# Exhibit H

# GORDON & FERGUSON®

ORIGINAL AUTHENTIC OUTFITTERS

— SINCE 1871 —

Date: December 31, 2007

To,
Darlene Maxwell
Field & Stream Holding, LLC
18 Kings Hwy North,
Westport, CT 06880

Dear Darlene:

Pursuant to the License Agreement, Section VI. D. 2., on behalf of G & F Licensing Corp., find please attached an official check # 419864676 in the amount of $1.00 representing the license fee payable to Field & Stream Holdings, LLC for the year ended December 31, 2007.

Sincerely,

Atul Goyal
CEO



# Exhibit I

**BROWNRUDNICK**

ALAN N. FORMAN
Direct dial: 212.209.4817
nforman@brownrudnick.com

Seven
Times
Square
New York
New York
10036
tel 212.209.4800
fax 212.209.4801

August 4, 2008

<u>VIA CERTIFIED MAIL</u>

G&F Licensing Corporation
c/o Gordon & Ferguson, Inc.
590 Park Street, # 6
Capital Professional Building
St. Paul, Minnesota 55103

Gordon & Ferguson of Delaware, Inc.
2915 Niagara Lane
Plymouth, Minnesota 55447

Sanddeep Chatrath, Esq.
The Chatrath Law Firm, P.C.
494 Eighth Avenue, Suite 505
New York, New York 10001

Re:   <u>Field & Stream License Agreement, dated October 28, 1988</u>

Gentlemen:

We are writing to you on behalf of our client, Field & Stream Licenses Company, LLC, in connection with that certain license agreement dated October 28, 1988 (the "License Agreement") by and between Field & Stream Licenses Company ("Field & Stream") and Gordon & Ferguson of Delaware, Inc., as transferred to Gordon & Ferguson, Inc. and assigned to G&F Licensing Corporation (collectively, "Gordon & Ferguson").

Please be advised that, by this letter, you are hereby notified of (i) the default by Gordon & Ferguson under the License Agreement and (ii) the termination of the License Agreement by Field & Stream as a result of such default. As you are aware, pursuant to the License Agreement, the following occurrence shall be deemed to be an Event of Default thereunder:

4.   The institution by [Gordon & Ferguson] of proceedings to be adjudicated a bankrupt or insolvent, or the consent by it to the institution of a bankruptcy or insolvency proceeding against it, or the finding by it of a petition or answer or consent seeking reorganization or relief under the Federal Bankruptcy Act or any other applicable Federal or State Law, or the consent by it to the to the filling of any such petition or to the appointment of a



Gordon & Ferguson of Delaware, Inc
August 4, 2008
Page 2

receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of [Gordon & Ferguson] of any substantial part of its property, or the making in by it of an assignment for the benefit of creditors, or the admission by [Gordon & Ferguson] in writing of its inability to pay its debts generally as they become due, or the taking of corporate action by [Gordon & Ferguson] in furtherance of any such action.

(License Agreement, at § X(B)(4)).

Among other things, there has been an admission in writing by Gordon & Ferguson of its inability to pay its debts generally as they become due or the taking of corporate action by Gordon & Ferguson in furtherance of such action. Indeed, we understand that Gordon & Ferguson has failed to make royalty payments as they became due in connection with other license agreements and has shut down it ongoing operations.

The foregoing facts constitute an Event of Default under the License Agreement providing Field & Stream with the right to terminate the License Agreement, in addition to any other rights and remedies available to Field & Stream at law or in equity by reason of such default. (License Agreement, at §§ X(A) and (B)(4)).

As a result of said default, Field & Stream hereby terminates the License Agreement and, accordingly, demands Gordon & Ferguson to immediately cease use of the Licensed Marks (as defined in the License Agreement), and any corresponding Licensed Registrations (as defined in the License Agreement), and any use, manufacture or sale of any Licensed Products (as defined in the License Agreement) anywhere in the world. Any continued use by Gordon & Ferguson of the Licensed Marks, and any corresponding Licensed Registrations, or any use, manufacture or sale of any Licensed Products will result in immediate action by Field & Stream. Field & Stream hereby further demands Gordon & Ferguson to immediately return to Field & Stream all documents in the possession of Gordon & Ferguson referring or relating to the License Agreement including, but not limited to, the Licensed Marks, Licensed Registrations and Licensed Products.

Field & Stream reserves all rights and remedies at law or in equity it may have arising under the License Agreement, or otherwise.

Very truly yours,

Alan N. Forman

cc:    Michael Heitner, Esq. (via certified mail)
       Paul Petrov (pptrov@att.net)
       Larry Martin, Chief Executive Officer
       Michael Tewey, President

# Exhibit J

**From:** jsnml@aol.com
**To:** Michael Tewey
**Sent:** Tue Jul 15 11:08:20 2008
**Subject:** Re: Mike Tewey (Field & Stream)
Mike:

12/8/2009

Gordon & Ferguson has ceased operations as of last month. I thought the bank would have gotten in touch with you. Atul and his team from India did not bring additional capital and the bank pulled credit for the company. I am taking couple of months off to regroup and recharge. Please get in touch with Capital Business Credit as far as Field & Stream is concerned. I will also not be able to execute your order for the jackets anymore.

Best regards,

Jaggi Singh

12/8/2009

# Exhibit K

# WEIL, GOTSHAL & MANGES LLP

767 FIFTH AVENUE

NEW YORK, NY 10153

(212) 310-8000

FAX: (212) 310-8007

AUSTIN
BOSTON
BRUSSELS
BUDAPEST
DALLAS
FRANKFURT
HOUSTON
LONDON
MIAMI
MUNICH
PARIS
PRAGUE
PROVIDENCE
SHANGHAI
SILICON VALLEY
SINGAPORE
WARSAW
WASHINGTON, D.C.

RONALD F. DAITZ
DIRECT LINE (212) 310-8337
E-MAIL: ronald.daitz@weil.com

August 15, 2008

**BY FEDERAL EXPRESS & E-MAIL**

Alan N. Forman, Esq.
Brown Rudnick
Seven Times Square
New York, NY 10036

Re:     G&F Licensing Corporation ("GFLC")

Dear Mr. Forman:

We have been asked by Capital Business Credit, LLC ("CBC") to respond to your letter of August 4, 2008. Your letter expressly recognizes the assignment of the October 28, 1988 License Agreement (the "License Agreement") to GFLC. CBC has provided financing to GFLC and has a security interest in all of GFLC's assets, including GFLC's rights under the License Agreement, and is currently the beneficial owner of GFLC.

As assignee of the licensee's rights under the License Agreement, it is manifestly clear that GFLC is now the Licensee referred to in the License Agreement and your client's purported termination of the License Agreement because of events related to an intermediary transferee (which events I might add do not rise to the level of an Event of Default as defined in the License Agreement) is ill conceived, an incorrect reading of the License Agreement and, manifestly, wholly without merit.

You should be aware that CBC and GFLC are actively working together to enhance the value of the Licensee's rights under and interest in the License Agreement, all in accordance with the terms thereof. If your client persists in ill founded attempts to thwart these efforts, GFLC and CBC intend to hold it strictly accountable for any and all

WEIL, GOTSHAL & MANGES LLP

Alan N. Forman, Esq.
August 14, 2008
Page 2

losses and other damages they suffer as a consequence.  On the other hand, based on copies of e-mail correspondence furnished to me, it appears that Mike Tewey of Field & Stream was intent on reaching out to CBC in respect of the Licensee.  If this is correct, CBC would be amenable to working with Field & Stream to realize for both parties the significant value of the License.

Very truly yours,

Ronald F. Daitz

# Exhibit L

Paul Petrov

Gordon Ferguson

420 East 61st Street

Suite 15A

New York, NY 10065

<u>CERTIFIED MAIL – RETURN RECIEPT REQUESTED</u>

<u>Re:</u> Field & Stream License Agreement

    Dated: October 28, 1988

January 19, 2009

Dear Mr. Petrov,

    Enclosed is your check for $10.00 and a copy of the termination letter that was sent on August 4th, 2008 with respect to the matter captioned above. As stated in the enclosed letter Gordon Ferguson no longer has any rights to manufacture and or sell any products under the Field & Stream Brand.

                                          Sincerely,

Larry Martin

                                            CEO



Field & Stream Holdings, LLC
18 Kings Highway North   Westport, Connecticut 06880
203-221-0050 Phone 203-221-0046 Fax
LMartin@FandS.com



PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

CERTIFIED MAIL

THIS CHECK CONTAINS THE FOLLOWING SECURITY FEATURES: MULTI-COLOR PRINTING ON FACE, WATERMARK IN PAPER, AND MICROPRINTING ON BORDER.

Mountain 1st
Bank & Trust

CASHIER'S CHECK    01/12/2009    111000297

PAY
ONLY

TEN DOLLARS AND ZERO CENTS **********

PAY TO THE
ORDER OF    Field & Stream Holdings, LLC

REMITTER    G & F Licensing Corp

CHECK 21  CHECK 21  CHECK 21  CHECK 2
SIGNATURE  SIGNATURE  SIGNATURE  SIGNATUR

AUTHORIZED SIGNATURE  CHECK
SIGNATURE  SIGNATURE  SIGNATURE  SIGNATUR

⑈111000297⑈ ⑆053112521⑆ 1000000008⑈

# Exhibit M



"10H Am, Driggs leche... — Working for the man, thinking about the hunt.

# Jackets

## CRAFTSMANSHIP & QUALITY

Jackets with the ability to withstand the elements while maintaining professional integrity. Ideal for any situation, from the boardroom to the bottom of the drift boat.



The Overland Long

Case 1:09-cv-10197-LTS   Document 1-1   Filed 12/15/09   Page 63 of 75

Field and Stream Jackets

$135.00



The Victor
$99.00



The Overland Short
$125.00



Field and Stream Jackets



The Roosevelt Jacket
$70.00




The Grumpy Jacket
$49.00



The Trigger Jacket
$80.00

Field and Stream Jackets



The Trigger Vest
$70.00



The Buddy Love Bomber
$70.00



The Row Back Jacket



12/1/2009

http://www.fieldandstreambrand.com/mens-jackets/

Field and Stream Jackets

$60.00

View Details

- CATALOG REQUEST
- MEDIA CENTER
- SITEMAP
- CONTACT US

877.221.6889

FIELD AND STREAM BRAND

- Mens Shirts
- Mens Pants
- Mens Outerwear
- Mens Accessories
- Collections
- Back Story

CONTACT FIELD AND STREAM

Field and Stream Brand
812 SW Raintree Ln,
Suite 22
Bentonville, AR 72712

877.221.6889
info@fieldandstreambrand.com

GET A CATALOG

 The Fall/Winter 09-10 Catalog has dropped! Throw it on the coffee table or send it to a web-challenged friend.

Request a Catalog

Field and Stream Jackets

CUSTOMER SERVICES

- Guarantee
- Shipping Information
- Return Policy
- Contact Us: Email, Phone and Fax Number, Address

BACKSTORY

Field & Stream combines an appreciation for America's history with the technical possibilities of modern day. New silhouettes and a focus on details are the key drivers of the new F&S clothing collection. These two concepts rediscover the Field & Stream heritage and uncover a new modern day lifestyle. With classic understated designs and an over attention to details, Field & Stream will become today's testament to tradition, heritage and the ever present influence of the outdoors.

FOLLOW US



2009 © Field and Stream Brand All Rights Reserved. Privacy Policy | Terms of Use

# Exhibit N

Gmail - Order Confirmation - 128241

Page 1 of 2



Glenn Schwartz <glenn.schwartz@gmail.com>

## Order Confirmation - 128241

1 message

sales@fieldandstreambrand.com <sales@fieldandstreambrand.com>
To: Glenn Schwartz <glenn.schwartz@gmail.com>

Fri, Aug 21, 2009 at 11:46 AM



## FALL—WINTER 2009-10
### WHAT YOU WEAR WHEN THE WADERS COME OFF

### Thank You for Your Order

From all of us at Field and Stream, thank you for your order.

Order #128241 2009-08-21

| Ship to | Bill to |
|---|---|
| Glenn Schwartz | Glenn Schwartz |
| 201 east 35th street | 201 east 35th street |
| apt 3C | apt 3C |
| New York, NEW YORK 10016 | New York, NEW YORK 10016 |
| Ground | glenn.schwartz@gmail.com |
| | 9178604405 |

| Item | Title | Size & Color | Quantity | Price |
|---|---|---|---|---|
| | The Row Back Jacket | Teton Green - L | 1 | $60.00 |
| | The Buddy Love Bomber | Coal Black - L | 1 | $70.00 |
| | The Overland Short | Dark Olive - L | 1 | $125.00 |

Subtotal: $255.00
Shipping: $11.65

Tax:    $0.00
Total:  $266.65

FieldAndStreamBrand.com

877.221.6889

Field and Stream Brand
812 SW Raintree Ln, Suite 22, Bentonville, AR 72712
info@fieldandstreambrand.com

2009 © Field and Stream Brand All Rights Reserved.

# Exhibit O



Yonkers, NY #321

Costco Wholesale #321
20 Stew Leonard Dr
Yonkers, NY 10710
MEMBER  #111734970570

400754 F&S W/HOOD          18.99 C
400754 F&S W/HOOD          18.99 C
285065 FIELD AND ST        12.99 C

SUBTOTAL                   50.97
C  4.375% TAX               2.23

VF  TOTAL                  53.20
    American Express       53.20

XXXXXXXXXXXX1004
10/25/09 14:37            SWIPED
Sea#: 007744 App#:  508838
American Express   Resp: AA
Tran ID#: 929842458000
Merchant ID 99032111

APPROVED - PURCHASE
AMOUNT: $53.20

0321 010 0000000065 0200
--------------------------------

CHANGE                        .00
TOTAL NUMBER OF ITEMS SOLD = 3
CASHIER: YAHAIRA
10/25/2009 14:38 0321 10 0200 REG# 10
                              65

THANK YOU!
PLEASE COME AGAIN!

# Exhibit P

 



::Home > Products > OUTERWEAR > Flannel / Quilted Jacket

**2010 MEN'S**

**OUTERWEAR**
- Jackets & Parkas
- Coats & Casual Jackets
- Utility - Work Wear
- Corduroy
- Shirts Jacket / Canvas
- Fleece & Soft Shells
- Flannel / Quilted Jacket
- Vest

**SHIRTS**

**PANTS & SHORTS**

**2010 LADIES**

**OUTERWEAR**

**SHIRTS**

**PANTS & SHORTS**

**SKIRTS**

### DAKOTA II

#7272 DAKOTA II
Yarn Dyed Cotton Flannel. 7 oz.
Heavy Weight . Quilted Nylon Lining, 4 oz.
Poly Filled. Cotton Fleece Hood. Zipper Fleece Chest
Protector. On Seam Lower Pockets. Two Chest Flap
Pockets.
Color: Navy, Jade, Earth and Brick
6 pcs by Color
*M-1, L-2, XL-2, XXL-1
Item #: 7272
Available
Qty in Case Pack: : 6 PCs
MSRP: $ 60.00

Wholesalers? View price or place order?
Click here register an account.


Brick


Earth


Jade


Navy

© 2009 Moose Creek Inc.

Home | Products | Tradeshows | About Us | Contact Us | Privacy Policy | Terms of Use

 



**2010 MENS**

**OUTERWEAR**
- Jackets & Parkas
- Coats & Casual Jackets
- Utility - Work Wear
- Corduroy
- Shirts Jacket / Canvas
- Fleece & Soft Shells
- Flannel / Quilted Jacket
- Vest

**SHIRTS**

**PANTS & SHORTS**

**2010 LADIES**

**OUTERWEAR**

**SHIRTS**

**PANTS & SHORTS**

**SKIRTS**

::Home > Products > OUTERWEAR > Utility - Work Wear



## UTILITY

#7253 UTILITY

Yarn Dyed Cotton/Polyester Flannel. Medium Weight . Two Flap Chest Pockets. Cotton/Polyester Waffle Knit Lining. Straight Bottom. Side Vents. Hidden Lower Pockets

Color: Assorted

18 pc Pre-Pack Asst Sizes & Colors.

*M-3, L-6, XL-6, XXL-3

Item #: 7253

Available

Qty in Case Pack: : 18 PCs

MSRP: $ 45.00

Wholesalers? View price or place order?
Click here register an account.

      

MIDNIGHT       SPICE          TEAL

         

ALASKAN       KODIAK        BIG-RIG       SAN PEDRO

© 2009 Moose Creek Inc.

Home | Products | Tradeshows | About Us | Contact Us | Privacy Policy | Terms of Use